UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



| STATE OF CONNECTICUT | : | 3 19mj 1459(SALm) |
| | : | |
| | : | ss: City of New Haven |
| COUNTY OF NEW HAVEN | : | |

### MASTER AFFIDAVIT

I, Joshua Cameron, having been duly sworn, state:

1.  I am a deputized Task Force Officer with the U.S. Drug Enforcement Administration (DEA) and am currently assigned to the New Haven District Office Organized Crime Drug Enforcement Task Force (NHDO).  I have been a DEA Task Force Officer for approximately 8 years.  I have also been employed as a Police Officer with the Hamden (CT) Police Department since February 2004.  I have received instruction relative to conducting drug investigations while attending the DEA Basic Narcotics Investigators Course in Franklin, Massachusetts, and while attending in-service training at the Connecticut Police Academy (POSTC) in Meriden, Connecticut.

### TRAINING AND EXPERIENCE OF THE AFFIANT

2.  During my tenure as a Police Officer and as a Task Force Officer, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking.  I have written and executed search warrants, which have resulted in the seizure of illegal drugs and evidence of drug violations. Over the past fifteen (15) years in law enforcement, I have executed seizure warrants which have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities. I have participated in numerous investigations involving individuals suspected of distributing illegal drugs, purchased illegal drugs, while acting in an undercover capacity, from targets of state and federal drug

investigations, coordinated controlled purchases of illegal drugs utilizing confidential

informants, cooperating witnesses and undercover police officers, written, obtained and

coordinated the execution of search and arrest warrants pertaining to individuals involved in the

distribution of illegal drugs, conducted electronic as well as physical surveillance of individuals

involved in illegal drug distribution, analyzed records documenting the purchase and sale of

illegal drugs, provided testimony in Grand Jury proceeding, and spoken with informants and

subjects, as well as other local, state and Federal law enforcement officers, regarding the manner

in which drug distributors obtain, finance, store, manufacture, transport, and distribute their

illegal drugs. I have also supervised the activities of cooperating witnesses who have provided

information and assistance in the federal prosecution of drug and weapon offenders.  In addition,

I also receive periodic in-service training relative to conducting drug investigations. As such, I

am familiar with the behaviors, methods and common practices of persons and organizations that

illegally traffic and distribute controlled substances, as well as the devices commonly utilized by

them.  Since 2010, I have participated in multiple Title III wiretap investigations and have served

as a co-case agent on many such investigations that spanned many months and which led to the

arrest and conviction of hundreds of defendants for violations of federal narcotics laws.

3.   As a result of my training and experience, I am familiar with the manner in which

controlled substances are commonly imported, manufactured, processed, packaged and

distributed.  I know the relative wholesale and retail value of various types of controlled

substances.  For example, I know that heroin is commonly distributed at the street level in

"bundles."  A "bundle" consists of ten, single dosage unit bags of heroin that are bundled or tied

together, with each bag containing between .02 and .03 grams of heroin.  Single-dosage unit bags

are often "stamped" with a brand name that is familiar to a particular distributor's customer base.

A "brick" of heroin consists of five (5) "bundles" (i.e., 50 single dosage unit bags).  The term "clip" is sometimes used to refer to ten "bundles" of heroin (i.e. 100 single dosage unit bags), and sometimes used to refer to five "bundles" of heroin. Based on my training and experience, I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets.  From my experience, I am familiar with many of the code words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics.

4.   During the course of my employment in law enforcement, I have participated in numerous narcotics trafficking and violent street gang investigations.  In connection with these narcotics trafficking and violent street gang investigations, I have conducted physical and electronic surveillance, debriefed narcotics traffickers, gang members and informants, have been the affiant on affidavits in support of arrests warrants and search and seizure warrants, and have executed numerous arrests warrants and search and seizure warrants.  I have also participated in wiretap investigations and have been the affiant on affidavits in support of applications seeking authorization to intercept communications pursuant Title III, which have been approved by the district court.

5.   As a result of my training and experience, I am familiar with the behaviors, methods and common practices employed by drug traffickers and violent street gang members, including but not limited to those discussed below.

6.   I am familiar with the paraphernalia and devices commonly utilized by narcotics traffickers.

7.   I am familiar with and have analyzed records documenting the illegal purchase of and sale of controlled substances.

8.   I am familiar with the practices commonly employed by narcotics traffickers and gang members to avoid detection by law enforcement.

9.    As indicated above, during my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved drug trafficking violations.  Search warrants relating to these investigations have covered cellular phones and computer devices used by drug traffickers to conduct their business, vehicles utilized by drug traffickers and their co-conspirators, residences of drug traffickers and their co-conspirators, premises and residences used by narcotics traffickers to process, "cook," and package narcotics for re-distribution, stash houses used as storage locations for controlled substances and drug proceeds, locations used as points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

10. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for federal felony offenses.  I am a participating member of the DEA New Haven District Office Organized Crime Drug Enforcement Task Force, which is comprised of personnel from the DEA, the United States Marshals Service ("USMS"), the New Haven Police Department ("NHPD"), the West Haven Police Department ("WHPD"), the Hamden Police Department ("HPD"), the Branford Police Department ("BPD"), the Meriden Police Department ("MPD"), the North Haven Police Department ("NoHPD), the East Haven Police Department ("EHPD") and the Ansonia Police Department ("APD").

11. I have personally participated in this investigation and I am familiar with the facts and circumstances of the offenses described in this affidavit. The statements contained in this affidavit are based upon my personal knowledge, on information provided by Special Agents and Task Force Officers of the DEA, FBI and the Waterbury Police Department on information developed through consensual recordings, controlled purchases of narcotics and physical surveillance, review of wire and electronic communications intercepted pursuant to orders of the District Court, information provided by confidential informants and cooperating witnesses, analysis of telephone call detail records and telephone subscriber information, on review of department of motor vehicles and court records, and my training and experience and that of other Special Agents and Task Force Officers of the DEA and other law enforcement personnel.  Since this affidavit is being submitted for the limited purpose of the warrants requested, I have not included each and every fact I know concerning this investigation. I have set forth only the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested warrants.

### DESCRIPTION OF THE REQUESTED WARRANTS

12.     I make this affidavit in support of an application for a search warrant for information associated with the following devices, which are referred to collectively as the "Target Phones":

  a. **Target Telephone 20**, a cellular device assigned phone number 347-683-8593 whose wireless provider is Sprint, a wireless communications service provider that is headquartered at 6480 Sprint Parkway Overland Park, KS;

  b. **Target Telephone 21**, a cellular device assigned phone number 917-688-6972 whose wireless provider is whose wireless provider is T-Mobile, a wireless

5

communications service provider that is headquartered at 4 Sylvan Way Parsippany, NJ;

c. **Target Telephone 22**, a cellular device assigned phone number 512-529-4068 whose wireless provider is Sprint, a wireless communications service provider that is headquartered at 6480 Sprint Parkway Overland Park, KS.

13.     The information to be searched is described in the following paragraphs and in Attachment A, and includes historical cell site activations for cellular towers operated by Sprint and T-Mobile (individually "Service Provider" and collectively the "Service Providers") which provide service to certain locations and certain specific dates and times. This affidavit is made in support of an application for search warrants under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the Service Providers to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

14.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## CHRONOLOGY OF THE COURT-AUTHORIZED INTERCEPTIONS OF TARGET TELEPHONE 1

15.     On September 28, 2018, United States District Judge Michael P. Shea authorized the interception of wire and electronic communications occurring over (347) 593-Target Telephone 1, subscribed to Katina M Reed, 1202 Baldwin St Apt 2, Waterbury, CT 06706, and serviced by

Sprint, a wireless telephone service provider and was being utilized by Keith JORDAN a.k.a. "KNOWLEDGE" for a period of thirty (30) days. Accordingly, interception of communications occurring over Target Telephone 1 commenced on September 28, 2018, and was discontinued on October 25, 2018. On October 25, 2018, United States District Judge Michael P. Shea authorized continued interception of wire and electronic communication occurring over Target Telephone 1 for a period of thirty (30) days. On October 25, 2018, interception of communications occurring over Target Telephone 1 commenced and were discontinued on November 21, 2018. On November 21, 2018, United States District Judge Michael P. Shea authorized the continued interception of wire and electronic communications occurring over Target Telephone 1 for a period of thirty (30) days. Accordingly, interception of communications occurring over Target Telephone 1 commenced on November 21, 2018 and ceased on December 12, 2018.

**OVERVIEW OF THE CHARGED CONSPIRACY AND THE JORDAN INDICTMENTS**

16. In February 2018, a Confidential Source ("CS") provided DEA with information regarding a black male known to him/her as "Knowledge," subsequently identified as Keith JORDAN of Waterbury, CT.  CS is cooperating in the hope that a third party who faces criminal charges will receive consideration in the disposition of those charges.  Information provided by CS has been corroborated by controlled purchases and through wire intercepts and other investigative steps taken in this investigation.  CS stated that JORDAN is a mid to upper level distributor of heroin and cocaine in Waterbury, CT.  CS stated that JORDAN claimed to have access to kilogram quantities of heroin and asserted he could supply CS with heroin for $58 per gram.  CS stated that he/she believed JORDAN to be sourced with bulk quantities of narcotics through his wife's (Katina Reed's) family members who reside in the Virginia area.  CS stated he/she was in a position to make controlled purchases of heroin from JORDAN as needed.  CS

further stated that a Hispanic male known as "Mingo," later identified by case agents and CS as Domingo ALVES of Waterbury, CT, is an alternate heroin source of supply to JORDAN. CS stated that he/she believes ALVES, in turn, has a source of supply who provides him with up to 500 grams of heroin at a time.

17. On July 12, 2018, CS conducted a buy from JORDAN for 16.2 grams of heroin as confirmed by DEA lab analysis. CS also laid the groundwork in this meeting for the introduction of a DEA Undercover officer ("UC"). On July 18, 2018, CS and UC met with JORDAN and conducted a buy for 50.75 grams of heroin (net as confirmed by lab analysis). Thereafter, the UC conducted additional heroin buys from JORDAN on August 1, 2018 (50 grams), August 14, 2018 (53.9 grams) and September 12, 2018 (99.8 grams). The suspected narcotics acquired were all confirmed to be heroin by DEA lab analysis.

18. On September 28, 2018, DEA began a wiretap of JORDAN'S phone (Target Telephone 1).[1] Intercepts confirmed that JORDAN was involved in the distribution of heroin and, to a lesser degree, cocaine to both re-distributors and end users. JAMES TYRONE HAYES, among others, is a street level distributor supplied by JORDAN. The intercepts frequently referenced terms unique to heroin distribution such as bags, bundles, "buns," and bricks. The intercepts also contained frequent references to prices being charged which were consistent with typical per gram heroin prices and also references to quantities. The intercepts coordinated with surveillance confirmed that Brian HANNA was JORDAN'S primary source for re-supplies of heroin. Intercepts also revealed that JORDAN also obtained heroin from two local Waterbury-based suppliers, Domingo ALVES and Pedro SANTOS. Intercepts also confirmed that

---

[1] Unless indicated otherwise, all of JORDAN'S intercepted communications described in this affidavit occurred over Target Telephone 1.

CARLOS MORAIS was a cocaine source of supply to JORDAN.  Both SANTOS and MORAIS

had their phones tapped and the intercepts revealed that MORAIS is supplied by JEAN

CARLOS FABAL-GONZALEZ and SANTOS is supplied by LARRY HALL.  Subsequently,

FABAL-GONZALEZ'S and HALL'S phones were also the subject of interception.  During

intercepts, investigators determined that HALL supplied JERMAINE FOSTER and JUNIO

ACEVEDO and that, in turn, ABREU-BAEZ was HALL'S source of supply.

19. There were a number of seizures during the course of the wiretap investigation that

corroborated the conclusions drawn from the wire intercepts, including the following:

- On October 26, 2018, Kendell Jordan and Kent Jordan obtained a quantity of heroin from Katina Reed after contacting KEITH JORDAN and being directed to see Reed at 66 Wakelee Avenue, Apartment 10, Wolcott, Connecticut ("Subject Premises 1") to obtain the heroin.  Kent Jordan picked up the heroin inside Subject Premises 1 from Reed and provided it to Kendell Jordan, who was waiting outside Subject Premises 1.  Kendall Jordan then conducted the transaction with a third party in front of Subject Premises 1.  Following the transaction, Waterbury PD executed a traffic stop and found the third party in possession of hypodermic syringes and 70 bags of heroin stamped "Say Less."

- On November 3, 2018, James Tyrone Hayes asked JORDAN for "4" JORDAN agreed and departed from Subject Premises 1 to meet HAYES. Surveillance observed them meet at Danbury Mall and JORDAN got into HAYES' car with a bag.  Jordan then got out minutes later and they both departed the area.  HAYES was pulled over by New York State Police on I-84 and troopers located 4 bricks (200 bags) of heroin stamped "Say Less" in the vehicle.

- On November 13, 2018, Keith JORDAN agreed to provide a third party with a quantity of heroin.  Surveillance observed JORDAN depart from Subject Premises 1 and then observed JORDAN and the third party meet at a Shop Rite parking lot in Wolcott, where the third party got into JORDAN'S car.  After the third party got back into his own car and left, Waterbury Police pulled him over and found him in possession of 14 bags of heroin stamped with the logo "the Hulk."  Intercepts indicated that JORDAN had obtained this brand of heroin from Pedro SANTOS..

- On December 1, 2018, intercepts between Keith JORDAN and Katina Reed indicated JORDAN intended to travel to the Bronx to meet Brian Hanna to obtain a re-supply of heroin.  JORDAN departed from Subject Premises 1.  Surveillance observed the meeting in the Bronx and DEA agents conducted a traffic stop in Ansonia, CT as Jordan was on his way back to Waterbury.  During the stop, case agents seized 3250 bags (65 bricks) stamped "Mullah" from JORDAN'S trunk.

20. On March 13, 2019, a federal grand jury returned an indictment in the United States District Court for the District of Connecticut captioned *United States v. Keith Jordan et al*, 3:19CR74 (JCH) charging the following individuals: KEITH JORDAN, a.k.a. "Knowledge," KATINA REED, a.k.a. "Tina," BRIAN HANNA, a.k.a. "Zo," KENDELL JORDAN, DAMON DAVIS, TIMOTHY BOOKER, a.k.a. "Book," TYRELL CAMPBELL, a.k.a. "Bricks", KENT JORDAN, a.k.a. "KJ" & "Curtis", JAMES TYRONE HAYES, a.k.a. "Ty," DOMINGO ALVES, a.k.a. "Mingo," LANCE BAPTISTE, CARLOS MORAIS, a.k.a. "Los," JEAN CARLOS FABAL-GONZALEZ, JORDAN JAMISON, PEDRO SANTOS, a.k.a. "Primo", LARRY HALL, a.k.a. "Chuito" and "Bobo", BIENVENIDO JIMENEZ-GONZALEZ, a.k.a. "Toto", JERMAINE FOSTER, ROSEMARY COLON, MICHAEL ALTIERI, OMAR HERNANDEZ, LLIVER FRANCISCO ABREU-BAEZ, a.k.a. "Papi" and "ABREU," SUNJI CRAMER, VINA FRAZIER, DAVID FLAHERTY, FRANCISCO LOPEZ, JUNIO ACEVEDO, NAZARIEL GONZALEZ, and JOSE GONZALEZ a.k.a "Checo" with Conspiracy to Distribute, and to Possess with Intent to Distribute, Heroin and Cocaine from February 2018 through March 2019 in violation of 21 U.S.C. Sections 841(a)(1) and 846.  KEITH JORDAN, ALVES, SANTOS, HALL, and ABREU-BAEZ were all the subject of a quantity allegation of 1 kilogram or more of heroin.  FOSTER and ACEVEDO were charged with a quantity of 100 grams or more of heroin. JORDAN, SANTOS, MORAIS, HALL, FABAL-GONZALEZ and ACEVEDO were also charged with 500 grams or more of cocaine.

10

21. On September 26, 2019, a federal grand jury returned a superseding indictment in the United States District Court for the District of Connecticut captioned *United States v. Keith Jordan et al*, 3:19CR74 (JCH) ("the Jordan Indictment") charging the following individuals: KEITH JORDAN, a.k.a. "Knowledge," KATINA REED, a.k.a. "Tina," BRIAN HANNA, a.k.a. "Zo," KENDELL JORDAN, DAMON DAVIS, TIMOTHY BOOKER, a.k.a. "Book," TYRELL CAMPBELL, a.k.a. "Bricks", JAMES TYRONE HAYES, a.k.a. "Ty," DOMINGO ALVES, a.k.a. "Mingo," LANCE BAPTISTE, CARLOS MORAIS, a.k.a. "Los," JEAN CARLOS FABAL-GONZALEZ, JORDAN JAMISON, PEDRO SANTOS, a.k.a. "Primo"9, LARRY HALL, a.k.a. "Chuito" and "Bobo," BIENVENIDO JIMENEZ-GONZALEZ, a.k.a. "Toto", JERMAINE FOSTER, ROSEMARY COLON, MICHAEL ALTIERI, OMAR HERNANDEZ, LLIVER FRANCISCO ABREU-BAEZ, a.k.a. "Papi" and "ABREU," VINA FRAZIER, DAVID FLAHERTY, FRANCISCO LOPEZ, JUNIO ACEVEDO, NAZARIEL GONZALEZ, and JOSE GONZALEZ a.k.a "Checo" with Conspiracy to Distribute, and to Possess with Intent to Distribute, Heroin, Cocaine, and Cocaine Base from February 2018 through March 2019 in violation of 21 U.S.C. Sections 841(a)(1) and 846.  JORDAN, REED, and HANNA were all the subject of a quantity allegation of 1 kilogram or more of heroin.

## PROBABLE CAUSE

**JORDAN Obtained a Re-Supply of Heroin on September 29, 2018, at Danbury Mall**

22.       At approximately 6:47 P.M. on September 29, 2018, JORDAN, using Target Telephone 1, answered an incoming phone call from Katina REED, who was using a cellular phone assigned call number 203-982-4441 ("Target Telephone 19") (session 243).  From the content of wire intercepts, REED, who has a prior federal conviction for narcotics trafficking in Virginia, has been identified as JORDAN's girlfriend or fiancé who is involved in his heroin

11

distribution activities.  During the call, REED told JORDAN that "he" said to call him once he arrived.  At approximately 7:08 P.M., JORDAN, using Target Telephone 1, called phone numbers 917-688-6972 (Target Telephone 21) (session 254) and 512-529-4068 (Target Telephone 22) (session 255) back to back, both of which went unanswered.  Based on cell site data, Target Telephone 1 was near the Danbury Fair Mall located at 7 Backus Avenue in Danbury, Connecticut, at the time.  Here, I believe JORDAN was attempting to contact HANNA regarding the resupply of heroin.  Subsequent toll analysis determined that both phones (Target Telephone 21 and Target Telephone 22) had Brooklyn-based subscribers and had been "dropped" or disconnected.

23.       At approximately 7:32 P.M., JORDAN, using Target Telephone 1, sent a text message to an unidentified male (UM4077) at phone number 203-507-4077 (session 259), asking "U good".  UM4077 responded by text message (session 261), "Yea".  JORDAN then texted UM4077 (session 263), "25 min".  Here, I believe JORDAN asked UM4077 if he was ready to be re-supplied with heroin ("U good") and that he was 25 minutes away from Waterbury.  This conversation, coupled with the short amount of time JORDAN spent in the area of the Danbury Fair Mall, leads me to believe that he met with the source of supply in the area of the mall between approximately 7:08p.m. and 7:32p.m. and acquired heroin.  I also believe that REED previously referenced the source of supply, believed to be her brother, when she told JORDAN to call "him" upon arrival.  Intercepts over Target Telephone 1 determined that JORDAN did not use this phone to contact the source of supply when he arrived in the area of the mall and investigators believe he likely used a secondary phone.

24.       At approximately 7:34 P.M., JORDAN, using Target Telephone 1, called Katina REED, a.k.a. "Tina" at Target Telephone 19 (session 265).  During the call, REED asked "You

12

seen my brother already?" and JORDAN replied "Yeah".  REED then asked JORDAN, "Ok, meet me at the house.  How long before you get to the house?"  JORDAN said, in part, "Its crazy traffic" and agreed to meet REED at "the old house," which I believe to be 1202 Baldwin Street in Waterbury, a stash location used by JORDAN, in the vicinity of which the controlled purchases of heroin conducted between July and September 2018 took place.  Based on this call, I further believe that JORDAN had met with REED's brother in the area of the Danbury Fair Mall for a re-supply of heroin and was traveling back to Waterbury.  Based on my knowledge of wire and electronic intercepts in this investigation, JORDAN and REED often referred to their heroin source as "Zo" or Reed's "brother," which I believe are references to HANNA.

25.      That same night (September 29), at approximately 7:50 P.M., JORDAN sent a text message to (UM4077) at telephone number 203-506-4077 (session 271) asking, "U ready". UM4077 replied (session 273), "Yea", and JORDAN texted (session 275), "Coming my up."[2] At approximately 8:05 P.M., JORDAN called Timothy BOOKER, a.k.a. "BOOK" (session 280) and had a brief conversation in which it was apparent they were about to meet at BOOKER's residence.  In a subsequent phone call on the same date (session 292), JORDAN told BOOKER that "two of 'em got stripes and two of 'em don't."  BOOKER said, "I'm gonna get a girl" and "I'm gonna give her the one with the two stripes."  Based on this conversation, I believe JORDAN was providing BOOKER with two samples of heroin.  BOOKER said he would give a female the heroin bags marked with a stripe to test.  Based on my training and experience, having individuals use the product to test its potency is unique to heroin distribution.  At approximately 8:23 P.M., JORDAN received an incoming call from an unidentified male

_____

[2] In this investigation, unidentified individuals communicating with JORDAN are referred to as UM or UF along with the last four digits of the phone number they are utilizing.

(UM7567) using telephone number 860-655-7567 (session 290).  During the call, JORDAN said, "Just getting back man" and "this nigga that [U/I] making motherfuckin' bunnies…they have some kind of mix that was just fire."  Here, I believe JORDAN told UM7567 he had just returned from meeting his source of supply who was now providing heroin in pre-packaged bundles ("making mothefuckin' bunnies") containing potent heroin ("fire") as opposed to raw, grams of heroin.  Based on the nature of these conversations, it is apparent that JORDAN was interested in providing heroin to various distributors immediately following the suspected re-supply meeting on September 29 with the source of supply.

**Jordan Obtained a Re-Supply of Heroin on October 7, 2018 from his Source in Bronx, NY**

26.    October 07, 2018, (session 1653), at approximately 8:21 A.M.,  REED utilizing a certain cellular device assigned 203-982-4441 (Target Telephone 19), called JORDAN on Target Telephone 1, which was intercepted. REED asked JORDAN "Did you left, cause it raining right now?" JORDAN replied "I'm about, I'm about to leave now." Based on this call, subsequent intercepts over Target Telephone 1 and cell site data for Target Telephone 1, JORDAN traveled to the Bronx, New York to get re-supplied with Heroin. REED was asking JORDAN if he left already because the weather was rainy. JORDAN in turn told her he was leaving at that moment.

27.    Cell site data for this communication (session 1653) showed Target Telephone 1 to be in the area of 66 Wakelee Road in Wolcott, Connecticut.  Cell site data received at approximately 8:34 A.M. showed Target Telephone 1 near Interstate-84 in Waterbury. Subsequent GPS and cell site data showed Target Telephone 1 moving in a southwest direction until it stopped in the Bronx, New York.  Specifically, at approximately 9:14 A.M., precision location data showed Target Telephone 1 near 3377 White Plains Road in the Bronx.  At approximately 10:05 A.M., JORDAN, using Target Telephone 1, called DAVIS (session 1674).

14

During the call, DAVIS said, "I'm good" and asked "the same?" JORDAN replied, "Yeah, yeah, def [sic] Joy and Pain". Based on my training and experience, as well as information gathered regarding this drug trafficking organization to date, I believe that DAVIS told JORDAN he was ready to be resupplied with heroin ("I'm good") and asked if the heroin JORDAN was obtaining in New York City would have the same "Joy and Pain" stamp ("the same?") as the prior re-supply on September 29. This leads me to believe that on October 7, JORDAN traveled from the Waterbury area (with his residence in Wolcott as the starting point) and acquired a bulk quantity of prepackaged heroin stamped "Joy and Pain" while in the area of 3377 White Plains Road in the Bronx shortly before this call. Again, based on my training and experience, heroin often is brand stamped so that dealers and users can differentiate different batches of heroin.

28.      Later, on October 7, 2018, (session 1842), at approximately 6:06 P.M., REED utilizing Target Telephone 19, called JORDAN on Target Telephone 1, which was intercepted. REED and JORDAN had the following conversation:

| | |
|---|---|
| REED: | Babe, what happened? |
| JORDAN: | I've said, I've told you [U/I] make some more. Go ahead make some. |
| REED: | Who called you? |
| JORDAN: | Can't hear you? |
| REED: | Who called you, gave you confirmation? |
| JORDAN: | Nah, Bricks told me said that his man said it was alright. |
| REED: | Damon? |
| JORDAN: | Can't hear you? |
| REED: | Damon? |
| JORDAN: | No Damon ain't call back... Bricks main man call back, said it was okay. |
| REED: | Alright. |
| JORDAN: | Alright. |

29. Based on my training and experience as well as information gathered regarding this organization to date, I believe that in this conversation, REED asked JORDAN about the quality of the Heroin they just received on the re-supply earlier that morning ("who called you, gave you

15

confirmation?"). JORDAN in turn replied that one of the re-distributors he sold heroin too "Bricks" told him (JORDAN) that the quality was okay ("Bricks main man call back and said it was okay").

**Jordan Obtained Another Re-Supply of Heroin in the Bronx on October 14**

30. On October 13, 2018, at approximately 11:41 A.M., JORDAN, using Target Telephone 1, answered an incoming call from Kendell JORDAN (K. JORDAN) (session 2577). During the call, JORDAN asked, "They still complaining about that" and K. JORDAN replied, "Nah...you said tomorrow you be alright?" JORDAN responded, "Yeah, my man should be good tomorrow he said" and K. JORDAN said, "Aight, if not I could still, if not I get more of those." Based on this call, I believe JORDAN referenced complaints from drug customers about heroin acquired through a secondary local source ("still complaining") and indicated that his primary source of supply ("my man") would be ready to supply JORDAN with heroin the following day ("good tomorrow he said").

31. On October 14, 2018, at approximately 7:07 A.M., cell site data showed Target Telephone 1 to be in the area of 66 Wakelee Road in Wolcott, Connecticut. Subsequent GPS and cell site data showed Target Telephone 1 moving in a southwest direction from the Waterbury area. At approximately 9:58 A.M., precision location data showed Target Telephone 1 to be in the area of 3377 White Plains Road in the Bronx, New York. At approximately 10:34 A.M., JORDAN, using Target Telephone 1, answered an incoming phone call from an unidentified male (UM9159) using phone number 203-490-9159 (session 3464). During the call, UM9159 told JORDAN that he was arrested the previous night with drugs and a firearm. JORDAN said, "I said I'll be home like 40 minutes I'll come check you out" and UM9159 asked, "Shit is looking good?" JORDAN responded, "Yeah, yeah" and UM9159 stated, "Word,

definitely need that shit." JORDAN told him, "As soon as I get there I'm going to come see you." At approximately 2:19 P.M., JORDAN, using Target Telephone 1, called K. JORDAN at phone number 203-206-1544 (session 3606). During the call, they discussed UM9159's arrest and K. JORDAN stated, "I'ma need another two". JORDAN said, "Is like the nigga didn't even tape no more man, they are not even taped, you know that…You wanna it taped, right?" and K. JORDAN replied, "Yeah." Here, I believe that K. JORDAN requested two bundles or bricks of heroin ("another two") and complained that his source of supply ("the nigga") failed to tape the bags of heroin ("not even taped"). I know from my training and experience, that pre-packaged heroin from New York City typically comes in glassine baggies that are individually taped and stamped with an image and/or phrase. I also know that heroin users often favor this type of packaging, which has a more professional appearance than heroin packaged in baggies that are not neatly taped and/or stamped. This explains JORDAN's apparent dissatisfaction with the appearance of the heroin provided by his source of supply and K. JORDAN's desire to sell bags of heroin that are taped. Based on the nature of the above conversations, I believe that JORDAN traveled from the Waterbury area to the area of 3377 White Plains Road in the Bronx on October 14, where he was re-supplied with heroin.

**REED Works with JORDAN in the Distribution of Heroin**

32. On September 30, 2018 (session 384) intercepted over Target Telephone 1 at approximately 1:27 P.M., REED, Target Telephone 19 called JORDAN on Target Telephone 1. During the conversation, REED asked JORDAN about a previous conversation he (JORDAN) had with Damon DAVIS about the quality of heroin they had to sell. JORDAN told her, "He said he had one person that said was ok, but I'm not going with that, he said he gonna need more for tomorrow, check it out. I'm waiting for (U/I) to call me back…I have someone who wants 300

17

of the, um, Joy and Pain" and REED responded, "They ain't got the Joy and Pain, baby."

JORDAN explained, "As I've said, he need to go back to that same dude" and REED exclaimed,

"He went back to the same dude, that dude ain't got it!"  This conversation leads me to believe

REED is involved in JORDAN's heroin distribution.  It also leads me to believe that she is

familiar with both DAVIS and the source of heroin from whom JORDAN acquires the "Joy and

Pain" stamped bags.

33.  On October 16, 2018, at approximately 12:05P.M., an unidentified male using phone

number 203-802-3221 called JORDAN, who was using Target Telephone 1.  During the call,

UM3221 inquired "hey, are you around?"  JORDAN responded "No, Tina is, what's up?"

UM3221 then said "Tina is…I wanna grab one.  Can she meet me anywhere, quick?"  JORDAN

said "yeah, call her.  Yeah, she should. Call her now."  UM3321 said "alright.  Alright, thanks."

Here, I believe that UM3221 asked JORDAN for one bundle of heroin ("wanna grab one") and

JORDAN directed UM3221 to contact KATINA REED who could provide UM3221 with the

requested quantity of heroin.

34. On October 19, 2018, (session 4787), at approximately 8:13 A.M., REED utilizing Target

Telephone 19, called JORDAN on Target Telephone 1, which was intercepted. REED and

JORDAN had the following conversation:

| | |
|---|---|
| JORDAN: | Hello! |
| REED: | Baby... You gave somebody five or something? |
| JORDAN: | I can't hear you. |
| REED: | You gave out five pieces? |
| JORDAN: |  I gave out one whole one, yeah! |
| REED: | [U/I] Needed everything [U/I] like... |
| JORDAN: | That what I just told you this morning, yeah! I told you, I took it out this |
| morning...you was in there knocked out sleepin!...I told you! | |
| REED: | Well before, you aint break..(U/I)....for forty dollars? |
| JORDAN: | I can't hear you. |
| REED: | One of them only got five pieces, like you took five out. |

18

| | |
|---|---|
| JORDAN: | Thats what I, thats what i took out today for, for umm, Ty |
| REED: | Five singles? |
| JORDAN: | Five whole ones, yeah! |
| REED: | (voices overlap)...five singles? |
| JORDAN: | Yeah! |
| REED: | You took out five singles too baby |
| JORDAN: | Huh? |
| REED: | You took out five singles! five little ones. |
| JORDAN: | Yeah, I took out five little ones this morning, yeah, I broke it off.... |
| REED: | No! Put this in here |
| JORDAN: | huh? |
| REED: | Alright....I'll just......bye, bye Keith! |
| JORDAN: | What you talkin bout! I dont know what you talkin about! You callin. |

35. Based on my training and experience as well as information gathered regarding this organization to date, I believe that in this conversation, REED asked JORDAN if he sold five bundles of Heroin ("You gave out five pieces?") that she did not know about. JORDAN indicated that he did sell one brick (5 bundles) of Heroin and that he mentioned it to her while she was sleeping ("I gave out one whole one, yeah"). I believe that REED was counting how many pre-packaged bundles of Heroin they had remaining and that the number was different from the last time she counted.

36. On October 25, 2018, (session 6294), at approximately 1:17 P.M., REED utilizing Target Telephone 19, called JORDAN on Target Telephone 1, which was intercepted. REED and JORDAN had the following conversation:

| | |
|---|---|
| JORDAN: | Hello. |
| REED: | Keith, do you remember when you got Damon out of jail and he short you 150, did he ever gave it to you? |
| JORDAN: | Can hear you? |
| REED: | Remembered when you got Damon out of jail. |
| JORDAN: | Yeah. |
| REED: | And he  [U/I] money, did he ever give you the 150? |
| JORDAN: | Yeah, he gave it to us, yeah. |
| REED: | Oh he did! |

19

| JORDAN: | It was 120 |
|---------|------------|
| REED: | Oh he gave it to you. |
| JORDAN: | Yeah, he gave it to me. |
| REED: | Alright. |
| JORDAN: | He must be getting on your nerve if you're getting like that. |

37. Based on my training and experience as well as information gathered regarding this organization to date, I believe that in this conversation, REED asked JORDAN if Damon had paid back a drug debt owed to both REED and JORDAN ("he short you 150, did he ever gave it to you?). JORDAN in turn advised REED that Damon in fact paid back the money Damon shorted them and JORDAN indicated that the amount was $120 not $150 that was owed ("It was 120")("he gave it to me").

**HANNA resupplied REED with heroin in the Bronx, New York on October 26, 2018**

38. On October 26, 2018 at approximately 8:17 A.M., JORDAN, using Target Telephone 1, called REED Target Telephone 19 (session 6401). During the call, JORDAN asked, "Did you talk to Zo?" and REED replied, "I'm going to see him this morning." JORDAN said, "Alright, as soon as you get back, I'm gonna need you to see somebody then...call them you be good" and REED acknowledged, "Alright."

39. Based on this conversation and what case agents have learned regarding this drug distribution organization, I believe that REED told JORDAN she would be traveling to meet their primary source of heroin ("Zo") during the morning hours ("I'm going to see him this morning"). I also believe that JORDAN told REED he would need her to conduct a drug transaction on his behalf when she returned from her meeting with "Zo" ("I'm gonna need you to see somebody").

40.  At approximately 8:30 A.M., REED was observed via pole camera departing her residence of 66 Wakelee Road in Wolcott, Connecticut, in her GMC sport utility vehicle.  REED's mother was also in the vehicle.  Based on previous intercepts over Telephone 1 regarding heroin resupply meets, historical precision location information from Target Telephone 1, and historical information from CS-1, case agents suspected that REED was traveling to the area of 3377 White Plains Road in the Bronx, New York to be resupplied with heroin by "Zo."  Case agents also suspected that REED's mother resides in the same area.

41. At approximately 9:32 A.M., JORDAN, using Target Telephone 1 called REED (session 6416).  During the call JORDAN said, "Tina don't forgot you got them two things on you" and she responded, "I know."  Here, I believe that REED left the residence in possession of two bricks of heroin ("them two things") in anticipation of the drug transaction JORDAN

42. At approximately 9:48 A.M., surveillance located REED's vehicle traveling southbound on Route 8 in Shelton, Connecticut.  Surveillance was maintained as she continued to and parked in front of 3377 White Plains Road in the Bronx.  At the address, surveillance saw REED and her mother exit the vehicle and go into the apartment building.  At approximately 1:03 P.M., surveillance observed REED exit the apartment building by herself and get into her vehicle.  REED was seen sitting in her vehicle using a cellular phone, continually looking into her side view mirror as if she was expecting someone to pull up next to her.  At approximately 1:24 P.M., surveillance saw a Jeep Grand Cherokee, with Georgia registration CGM3714, park across the street from REED.  Surveillance observed a black male, later identified through his Pennsylvania driver's license photo as Brian HANNA, exit the Jeep, walk across the street while carrying a white plastic bag, and get into REED's front passenger seat.  Approximately two

minutes later, surveillance observed HANNA exit REED's vehicle without the plastic bag, cross the street and get into the Jeep.  HANNA then departed the area.

43. Based on my training and experience, I believe the short length or the meeting between HANNA and REED, coupled with HANNA transferring custody of the plastic bag to REED, is consistent with a narcotics transaction.  A registration inquiry determined the Jeep to be an Enterprise rental vehicle.  Case agents contacted Enterprise and learned that HANNA rented the vehicle from Norfolk, Virginia on October 22, 2018.  A criminal history inquiry for HANNA lists his alias as "Ronny Buzo", which I believe to explain the source's nickname of "Zo".

44. According to Enterprise, HANNA provided Enterprise phone numbers 929-308-6124 (Target Telephone 11) and 347-683-8593 (Target Telephone 20).  Thus, I believe that HANNA utilized Target Telephones 11 and 20.  Based on toll analysis, REED, using Target Telephone 19, sent a text message to 929-308- 6124 ("Target Telephone 11") on this date at approximately 5:15 A.M.  This phone number was subscribed to "Malkia Walker," 130 Lefferts Pl, Brooklyn, New York.  There was no further contact between REED and either of HANNA's reported phone numbers on this date.  This information supports my belief that JORDAN and REED primarily communicate with HANNA over secondary cellular devices or an encrypted communication application, such as WhatsApp.

45. Surveillance of REED was maintained as she left the Bronx and traveled to her residence.  At approximately 4:01 P.M., REED was observed via pole camera entering her residence through the front door.  Surveillance was then terminated.  Subsequent intercepts over Target Telephone 1 evidenced that JORDAN and REED had heroin to sell.

**Seizure of Heroin and Statements from JORDAN on December 1, 2018**

46. On December 01, 2018, based on intercepted telephonic communication over Target Telephone 1, at approximately 7:13 a.m., JORDAN utilizing Target Telephone 1, session 13333, placed an outgoing telephone call to REED.  During the call, JORDAN stated that he got down to New York safely but was stuck in traffic on his way back near Exit 21.  Based on this intercepted call, it is believed that JORDAN already traveled down to New York and met with HANNA and was on his way back to the Waterbury area with a re-supply of Heroin. Subsequently, TFO Joshua Cameron was able to check historical precise location data which revealed that JORDAN left his residence around 4:20 A.M. and that he traveled directly to 3377 White Plains Road, Bronx and arrived at approximately 5:46 A.M. TFO Cameron further observed that JORDAN stayed in the area of 3377 White Plains Road, Bronx for approximately 20-25 minutes and then he started to travel North toward Connecticut.

47. Based on the intercepted calls and the very short duration JORDAN stayed in the Bronx, NY it is believed that JORDAN received a re-supply of heroin and would be traveling back to the Waterbury area with a substantial amount of pre-packaged heroin.

48. Members of the DEA NHDO subsequently conducted a traffic stop of JORDAN in Ansonia, CT. During the course of the traffic stop, approximately 65 bricks (3,250) bags of heroin stamped "Mullah" were located in the trunk of his vehicle.  JORDAN was also in possession of Target Telephone 1 at the time of the traffic stop.  JORDAN provided DEA Agents with a post arrest statement and confirmed that HANNA was his primary heroin source of supply.  JORDAN explained that HANNA is a close friend of REED, and that REED coordinates the heroin resupply meetings with HANNA through an encrypted telephone app,

thus explaining the minimal direct calls between Target Telephone 1 and Target Telephone 11 surrounding the above narcotics transactions.

49. JORDAN said that prior to being stopped that day, he had picked up approximately 50 or 60 bricks of heroin from "Zo" at 3377 White Plains Road in the Bronx, New York. He said that "Zo" arrived in a black Jeep to conduct the sale. JORDAN was shown a PA driver's license photo of Brian HANNA and positively identified him as "Zo."

50. JORDAN said the most heroin he acquired from "Zo" at one time was 80 bricks. He explained that he typically acquired 50 to 60 bricks, and had been dealing with "Zo" steadily for about 8 months. JORDAN stated that he acquired heroin from "Zo" about every other week. JORDAN explained that the resupply meetings with HANNA occur in front of a building located at 3377 White Plains Road or at the Danbury Fair Mall in Danbury, CT.

51. JORDAN stated that REED contacted HANNA the previous day to arrange the heroin transaction. JORDAN said that REED has a secondary cellular telephone, serviced by Boost Mobile, on which she uses an encrypted app called "Signal" to communicate with HANNA. JORDAN did not know the phone number assigned to this secondary telephone. JORDAN stated that REED primarily uses Target Telephone 19.

52. JORDAN also said he does not communicate with HANNA directly and that REED arranges all heroin resupply meetings him.

**Seizure of Target Telephones 1 and 19 and Arrests of JORDAN and REED**

53. On March 20, 2019, members of the DEA executed the arrest warrants for JORDAN and REED as well as the search warrant for Subject Premises 1. At approximately 6:00 a.m., participating personnel approached the front door of Subject Premises 1. All personnel were wearing clearly marked and clearly visible law enforcement identification. DEA personnel then

24

knocked on the front door several times and announced, "Police with a Search Warrant." There was no response. The door was forcibly opened. JORDAN and REED were arrested in the third floor bedroom without incident.

54. JORDAN and REED were brought into the living room where they were met by law enforcement personnel. There, a DEA member gave JORDAN and REED their *Miranda* warnings verbally, via DEA Form 13. Both JORDAN and REED stated that they understood their rights.

55. A DEA member asked JORDAN where his cellular telephone was and what was the number. JORDAN stated that his phone was in his bedroom and the number was 347-742-9292 (Target Telephone 1). REED was asked the same. REED stated that her phone was in her bedroom plugged in and that her number was 203-982-4441 (Target Telephone 19). DEA members retrieved both phones. JORDAN identified Target Telephone 1 as his cell phone and Target Telephone 19 as REED's cellphone. DEA members then seized Target Telephones 1 and 19 pursuant to the warrant.

**Seizure of Target Telephone 11 and Arrest of HANNA**

56. On March 20, 2019, the DEA conducted an arrest and search warrant operation targeting HANNA and others that that grand jury indicted. On March 21, 2019, USMS personnel tracked Target Telephone 11, which Enterprise indicated was a number that HANNA provided to it, to an address in Moreno Valley, CA. When agents entered this location in search of HANNA, they discovered that Target Telephone 11 was at the address, but that HANNA was not present. Law enforcement seized Target Telephone 11 at that time.

57. On April 15, 2019, HANNA was arrested by the Midlothian, TX Police Department during a commercial vehicle stop on U.S. Highway 67. HANNA was a passenger in the truck

and initially gave officers a fraudulent name. Officers determined HANNA's true identity and

HANNA said that he was "on the run." The driver of the truck said he had picked up HANNA in

San Diego, CA, and that he knew HANNA as "Zoe."

**Call Detail Records Show Common Contacts Between Target Telephones 20, 21, and 22**

58. Law enforcement obtained call detail records for Target Telephones 20, 21, and 22, all

believed to be utilized by HANNA during the course of the conspiracy. As mentioned above,

Enterprise indicated that HANNA provided it with Target Telephone 20 and JORDAN contacted

Target Telephones 21 and 22 one minute apart when he was near the Danbury mall on

September 29, 2018 to pick up a re-supply of heroin.

59.  Common call analysis on Target Telephones 20, 21, and 22 demonstrates that:

   a.  Target Telephones 21 and 22 both had contact with Target Telephone 1, which

       Jordan utilized.

        i.  Target Telephone 21 called Target Telephone 1 on September 21, 2018.

       ii.  Target Telephone 22 had 12 contacts with Target Telephone 1 between

            September 8, 2018 and September 29, 2018.

   b.  Target Telephones 21 and 22 both had contact with telephone number (570) 32*-

       ***3.

        i.  Target Telephone 21 had 13 contacts with (570) 32*-***3 between

            August 2, 2018 and August 6, 2018.

       ii.  Target Telephone 22 called (570) 32*-***3 on September 8, 2018.

   c.   Target Telephones 20 and 21 both had contact with (301) 28*-***3.

        i.  Target Telephone 20 had 3 contacts with (301) 28*-***3 between

            February 3, 2019 and March 16, 2019.

     ii. Target Telephone 21 received a call from (301) 28*-***3 on September 4, 2018.

   d. Target Telephones 20 and 22 both had contact with (347) 59*-***1.

     i. Target Telephone 20 had 3 contacts with (347) 59*-***1 on November 9, 2018.

     ii. Target Telephone 22 had 15 contacts with (347) 59*-***1 between August 31, 2018 and September 14, 2018.

60. Given that (i) HANNA provided Enterprise with the phone number for Target Telephone 20; (ii) JORDAN contacted Target Telephone 21 and Target Telephone 22 only a minute apart on September 29, 2018 when he was near the Danbury mall for a re-supply of heroin; and (iii) the common call analysis demonstrates that Target Telephones 20, 21, and 22 share common contacts, I believe that HANNA utilized Target Telephones 20, 21, and 22.

## CONCLUSION

61. Based on the forgoing, there is probable cause to believe, and I do believe that HANNA committed violations of Title 21 U.S.C. §§ 841(a)(1) and 846 and that obtaining cell site data and precision location data for the Target Phones will allow agents to more precisely determine HANNA's locations during the course of the conspiracy.

62. In my training and experience, I have learned that individuals typically carry their cellular phones on their person at all times so that they can communicate with others.

63. In my training and experience, I have learned that the Service Providers are companies that provide cellular communications service to the general public.  I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service,

including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device. In addition, some providers of cellular communications service have technical capabilities that allow them to provide ranging information which shows that approximate distance that a device was from the cell tower, when it made connection with that tower. This information is referred to as by several names, including Per Call Measurement Data (PCMD), RTT, Timing Advance (TA) data, and "True Call" data.

## Cell-Site Data

64. Based on my training and experience, I know that the Provider can collect cell-site data on a prospective basis about the Target Phones. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Providers typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

28

65. Based on my training and experience, I know that the Service Providers also can collect Timing Advance Data, which the Provider also refers to as the "True Call." This type of data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

<b><u>Subscriber Information</u></b>

66. Based on my training and experience, I know that wireless providers such as the Service Providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users and may assist in the identification of co-conspirators.

67. Based upon the investigation, I believe that JORDAN operated Target Phone 1, HANNA operated Target Phone 11, and REED operated Target Phone 19 during the period of criminal activity and that obtaining the requested records and data related to Target Phones 1, 11, and 19 will allow Agents to determine JORDAN's, HANNA's, and REED's location during the federal criminal violations detailed above. Specifically, I believe the following:

a.   Obtaining call detail records with historical cell site data, along with Timing

Advance data for Target Phones 20, 21, and 22 for the time period of January 1,

2018 to December 1, 2018, will allow investigators to determine HANNA's

locations during the criminal activity.

## AUTHORIZATION REQUEST

68. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to

18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

69. I also request that the Court direct the Service Provider's furnish the government all

information, facilities, and technical assistance necessary to accomplish the collection of the

information described in Attachment B unobtrusively and with a minimum of interference with

the Service Provider's services, including by initiating a signal to determine the location of the

Target Phones on the Service Provider's network or with such other reference points as may be

reasonably available, and at such intervals and times directed by the government.  The

government shall reasonably compensate the Provider for reasonable expenses incurred in

furnishing such facilities or assistance.

Joshua Cameron, DEA TFO

Subscribed and sworn to before me on the 8th day of October, 2019.

/s/ Sarah A. L. Merriam, USMJ

HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

30

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned phone number 512-529-4068 (referred to in Attachment B as the "Subject Phone") whose wireless provider is Sprint, a wireless communications service provider that is headquartered at 6480 Sprint Parkway Overland Park, KS (referred to in Attachment B as the "Provider").

## ATTACHMENT B

### Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a. The following subscriber and historical information about the customers or subscribers associated with the SUBJECT PHONE for the time ~~January 1~~, 2018 to December 1, 2018: April 1, 2018

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

2

      viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT PHONE, including:

      (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      (ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as Timing Advance data (also known as "True Call")

c.  Information associated with each communication to and from the SUBJECT PHONE from ~~December 1, 2016 to May 31, 2017,~~ including: *Dated Jan. 1, 2018 to Dec. 1, 2018.*

      i.  Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

      ii.  Source and destination telephone numbers;

      iii.  Date, time, and duration of communication; and

      iv.  All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the SUBJECT PHONE connected at the beginning and end of each communication as well as Timing Advance data (also known as "true call").

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. Sections 841(a)(1) or 846.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ (the "Provider") and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of the Provider. The attached records consist of

_____. I

further state that:

      a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of the Provider, and they were made by the Provider as a regular practice; and

      b.      such records were generated by the Provider electronic process or system that produces an accurate result, to wit:

            1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of the Provider in a manner to ensure that they are true duplicates of the original records; and

            2.      the process or system is regularly verified by the Provider, and at all times pertinent to the records certified here the process and system functioned properly and normally.

      I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

DATE                                              SIGNATURE